**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **RICHARD ZANOL**, Individually, and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>**QUANEX BUILDING PRODUCTS CORPORATION, GEORGE L. WILSON**, and **SCOTT M. ZUEHLKE**,<br><br>Defendants. | Case No. 4:25-cv-04453<br><br>CLASS ACTION<br><br><u>JURY TRIAL DEMAND</u> |

**PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I.  SUMMARY OF THE ACTION ............................................................................................ 1

II. JURISDICTION AND VENUE ......................................................................................... 6

III. PARTIES ........................................................................................................................... 6

    A.  Plaintiffs .................................................................................................................. 6

    B.  Defendants ............................................................................................................... 7

IV. SUBSTANTIVE ALLEGATIONS ................................................................................... 8

    A.  Defendants' Goal Was for Quanex to Generate $2 Billion in Annual Revenue, but They Could Not Come Close to Hitting that Level Without a Large Acquisition ... 8

    B.  To Achieve Their $2 Billion Annual Revenue Goal, Defendants Determined that Quanex Needed to Acquire a Competitor Called Tyman ........................................ 9

    C.  Tyman's Manufacturing Facilities—Especially Its Critical Monterrey Facility—Used Outdated and Poorly Maintained Equipment that Caused Delays, Low-Quality Production, Lost Revenue, and Low Earnings ........................................ 10

    D.  Prior to the Acquisition, Defendants Conducted Extensive Due Diligence into Tyman, Including Its Critical and Poorly Performing Manufacturing Facilities ... 20

    E.  Defendants Issued a False and Misleading Proxy Statement in June 2024 Soliciting Approval of the Tyman Acquisition from Quanex's Shareholders, Which Was Granted in a July 2024 Vote ................................................................................ 21

    F.  After the Acquisition Closed, the Poor Production, Customer Backlogs, and Cancellations at the Legacy Tyman Facilities Continued, Harming Quanex ........ 22

    G.  Defendants Made False and Misleading Statements Touting Quanex's and Legacy Tyman's Manufacturing Throughout the Class Period ........................................ 25

    H.  In September 2025, Defendants Finally Disclosed the Truth—that the Monterrey Facility Was Performing Poorly, Causing Backlogs, and Required Expensive Fixes—Which Caused Quanex's Stock to Plummet ............................................ 25

V.  FALSE AND MISLEADING STATEMENTS IN VIOLATION OF EXCHANGE ACT §14(A) .............................................................................................................................. 26

    A.  The Proxy Claims .................................................................................................. 26

B.    The Proxy Statement's False and Misleading Claims............................................ 27

VI.    FRAUDULENT STATEMENTS IN VIOLATION OF EXCHANGE ACT §10(B) ....... 31

A.    Defendants' False and Misleading Statements ........................................................ 31

B.    Defendants Made the Fraudulent Statements with Scienter.................................... 35

VII.    THE TRUTH EMERGES ........................................................................................ 41

VIII.    LOSS CAUSATION.................................................................................................. 43

IX.    CLASS ACTION ALLEGATIONS .................................................................................. 45

X.    APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND AFFILIATED UTE  .....
PRESUMPTIONS OF RELIANCE.................................................................................. 47

XI.    NO SAFE HARBOR ................................................................................................ 49

XII.    PROXY CLAIMS.................................................................................................... 50

XIII.    FRAUD CLAIMS.................................................................................................... 52

XIV.    PRAYER FOR RELIEF ........................................................................................... 56

XV.    JURY TRIAL DEMANDED...................................................................................... 57

Plaintiffs Roofers' Pension Fund and Erie County Employees' Retirement System (together, the "Plaintiffs"), by and through their attorneys, and on behalf of all others similarly situated, allege the following as to Plaintiffs and Plaintiffs' own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, which includes, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings made by Quanex Building Products Corporation ("Quanex" or the "Company"), analyst and media reports, conference call transcripts, Company press releases, interviews with former Company employees, and other publicly available information. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein.

## I.    SUMMARY OF THE ACTION

1.    This action involves materially false and misleading statements and material omissions made by Defendants Quanex, its Chief Executive Officer George Wilson, and its Chief Financial Officer Scott Zuehlke (together, the "Defendants"). Those statements concealed significant operational failures at key Quanex manufacturing facilities, which were causing backlogs, customer cancellations, employee injuries, and increased costs. Defendants had acquired those facilities through a transaction that was critical to improving Quanex's then stagnating performance—the acquisition of its competitor Tyman plc ("Tyman"). Plaintiffs assert: (a) strict liability and negligence claims for violations of §§14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") in connection with Quanex's false and misleading Proxy Statement, issued on June 6, 2024, by which Defendants solicited shareholder approval for the Tyman acquisition; and, separately, (b) securities fraud claims for violations of §§10(b) and 20(a) of the Exchange Act, in connection with false and misleading statements that Defendants made from June 6, 2024 through September 5, 2025. Plaintiffs bring these claims on behalf of a class consisting of all persons and entities that: (a) held shares of Quanex common stock on the

1

June 4, 2024 record date of the acquisition and were entitled to vote on Quanex's proposed acquisition of Tyman; and/or (b) purchased or otherwise acquired Quanex's common stock during the period of June 6, 2024 to September 4, 2025, inclusive (the "Class Period"); and were damaged thereby (the "Class").

2.      In September 2022, CEO Wilson, dissatisfied with Quanex's performance, announced plans to dramatically to "achieve $2 billion of revenue" annually.  Quanex, which manufactures and sells components for windows and doors, then had annual revenue stuck at about $1 billion—meaning that Defendants were planning to almost double the Company's output.  Defendants planned to grow revenue by convincing customers to purchase more of Quanex's existing products, and if necessary to expand through corporate acquisitions or new product development.

3.      This growth plan quickly failed.  Customers did not order more products, leading Quanex's revenue to fall in fiscal year ("FY") 2023 and drop even further through the first three quarters of FY 2024.

4.      Needing to reverse this declining performance and make progress toward their $2 billion annual revenue plan, Defendants decided to undertake a large acquisition.  They targeted Tyman, another manufacturer of window and door components.  Tyman had the exact amount of revenue Defendants were searching for.  If Tyman's FY 2023 revenue had been added to Quanex's FY 2023 revenue, Quanex would have essentially hit its $2 billion goal.

5.      However, Tyman had longstanding and substantial problems at its manufacturing facilities—which represented the core of its business and the acquisition.  Tyman's manufacturing facilities were outdated, with decades-old machinery that Tyman systematically failed to maintain or fix this issue.  As a result, Tyman's manufacturing facilities regularly failed to finish orders on

2

time, made poor quality products, and injured workers. This caused a backlog of customer orders, customer cancellations, and higher costs as Tyman struggled to satisfy customers—negatively impacting Tyman's revenue and earnings.

6. These problems were particularly pronounced at Tyman's manufacturing facility in Monterrey, Mexico (the "Monterrey Facility"). That Facility was a critical hub which produced components other Tyman facilities depended on and sold.

7. Defendants conducted extensive due diligence into Tyman's business and operations on and off over 20 months leading up to the acquisition, from September 2022 to April 2024. This specifically involved investigating Tyman's poorly performing manufacturing facilities, which were key to accurately assessing Tyman's value and the work required to merge Tyman with Quanex.

8. On June 6, 2024, Defendants issued a false and misleading Proxy Statement (the "Proxy Statement") to solicit the approval of Quanex shareholders for the Tyman acquisition. For example, the Proxy Statement claimed that acquiring Tyman enabled Quanex to "***capitalize on expanded engineering, design and manufacturing capabilities[.]***" But, in truth, Quanex could not "capitalize" on Tyman's "manufacturing capabilities[,]" because the Monterrey Facility and other Tyman facilities were systematically outdated, poorly maintained, and understaffed, leading to backlogs and cancelled orders. The Proxy Statement also claimed that "***[p]otential areas of dis-synergy***"—i.e., increased operational costs—"***expected to arise in connection with the Transaction have been considered and were determined by the Quanex Directors to be immaterial for the analysis***." However, to the contrary, Quanex faced millions of dollars of increased costs from having to operate the inefficient Tyman facilities, address dissatisfied

3

customers, and update machinery—including an overhaul of the Monterrey Facility announced at the end of the Class Period.

9.      Based on these false and misleading solicitations in the Proxy Statement, Quanex shareholders approved the Tyman acquisition on July 12, 2024.  By negligently preparing the Proxy Statement, Defendants violated §14(a) of the Exchange Act (the "Proxy Claims").

10.      Quanex closed the Tyman acquisition on August 1, 2024, and immediately began further investigating the legacy Tyman manufacturing facilities, which were continuing to suffer from their substantial operational problems and were now harming Quanex.  As CFO Zuehlke explained in September 2024, Quanex was "performing a full physical inventory count at all legacy Tyman manufacturing plants prior to our fiscal year end on October 31[, 2024]."  Customers were also complaining to Quanex about the deeply engrained problems at the Monterrey Facility.  By January 2025, Quanex sent its Director of Operations to the Monterrey Facility to try to fix its poor performance, and was investing money into that effort.  Due to its substandard machinery and maintenance, the Monterrey Facility then had a backlog of customer orders worth about $2 million and workers commonly suffering injuries.

11.      Nevertheless, Defendants made false and misleading statements denying those substantial problems at the Monterrey Facility and other legacy Tyman facilities.  For example, on March 11, 2025, Wilson claimed:

> ***Operationally, I'm very pleased with our performance and the improvements we've already seen as part of the integration process. We achieved record safety performance in the first quarter, along with improvements in service and quality metrics. These gains are the results of sharing best practices between the legacy Quanex and Tyman teams, as well as the benefit of migrating to our new operating segments.***

But, in fact, the legacy Tyman facilities were already disrupting customers due to their deeply flawed operations.  The Monterrey Facility alone had massive customer backlogs and was

4

producing low quality products that customers would not accept, which was leading customers to cancel orders because those legacy Tyman facilities were not reliable. The poorly maintained machinery at the root of these problems was also regularly injuring workers, in particular at the Monterrey Facility.

12. Defendants, moreover, knew of these problems even as they denied them to investors. Quanex received data on the Monterrey Facility's poor production, sent their Director of Operations to fix the Monterrey Facility, and conducted extensive investigations over several years into the legacy Tyman facilities, which were at the core of the Tyman acquisition and integration into Quanex. By making fraudulent statements during the Class Period such as Wilson's March 11, 2025 claim, Defendants violated §10(b) of the Exchange Act (the "Fraud Claims").

13. Defendants were forced to reveal the truth on September 4 and 5, 2025, when they reported low adjusted EBITDA for the quarter just ended, 3Q 2025, and reduced revenue and EBITDA guidance for the remainder of FY 2025. In an earnings release and follow up conference call, Defendants admitted that this poor performance was due to "operational challenges related to the legacy Tyman window and door hardware business in Mexico," specifically the Monterrey Facility. They also admitted that, these were "operational issues we inherited" from Tyman, that Tyman's operations were "not up to the standards" of Quanex, and had gotten "to a point where if you're not maintaining tools and equipment, but you continue to try to run and you block off cavities, then it creates quality problems and other issues, and it will eventually catch up to you." As a result, "we had to make some changes and fix some things before it was catastrophic." These fixes were costing Quanex millions of dollars, which was "not sparing any expense" because "the priority is fixing Monterrey and getting that solved."

5

14.     In response to these revelations, Quanex's common stock price plummeted over 13% on Friday, September 5, 2025, and another 11% on Monday, September 8, 2025.  This eliminated about $218 million in shareholder value and damaged Plaintiffs and the Class.

## II.     JURISDICTION AND VENUE

15.     The claims asserted herein arise under §§10(b), 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78n(a), and 78t(a)) and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC (17 C.F.R. §§240.10b-5, 240.14a-9).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

17.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa(a)).  At all relevant times, Quanex was headquartered and conducted business in this District at 945 Bunker Hill Road, Suite 900, Houston, Texas 77024.  In addition, many of the acts charged herein, including the preparation and dissemination of materially false, misleading, and/or omitted information, occurred in substantial part in this District.

18.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and facilities of a national securities exchange.

## III.     PARTIES

### A.     Plaintiffs

19.     Lead Plaintiff Roofers' Pension Fund ("Roofers" or "Lead Plaintiff"), as set forth in its certification (ECF No. 15-2), purchased Quanex's common stock during the Class Period and suffered damages as a result of Defendants' violations of the federal securities laws alleged

6

herein.

20.     Plaintiff Erie County Employees' Retirement System ("Erie"), as set forth in the certification attached hereto, purchased shares of Quanex common stock which it held as of the June 4, 2024 record date of the acquisition and entitled it to vote on the acquisition, also purchased Quanex's common stock during the Class Period, and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

### B.     Defendants

21.     Defendant Quanex is a corporation organized and existing under the laws of Delaware with its principal place of business in Houston, Texas.  Its common stock trades on the New York Stock Exchange ("NYSE") under the symbol "NX."  During the Class Period, Quanex, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, violated federal securities laws and contained materially false and/or misleading statements and omissions.

22.     Defendant George L. Wilson ("Wilson") was, at all relevant times, the Company's CEO and a member of Quanex's Board of Directors (the "Board").  Additionally, on December 27, 2024, Wilson became Chairman of Quanex's Board.  Throughout the Class Period, Wilson made statements in the Company's, on earnings calls, and at Quanex's February 6, 2025 Analyst/Investor Day and signed the FY 2024 annual report filed on SEC Form 10-K and the Definitive Proxy Statement to the Company's shareholders filed pursuant to Schedule 14A, which, as alleged herein, violated federal securities laws and contained materially false and/or misleading statements and omissions.

23.     Defendant Scott M. Zuehlke ("Zuehlke") was, at all relevant times, the Company's CFO.  Prior to becoming CFO, Zuehlke was Quanex's Vice President of Investor Relations and at all relevant times continued to be listed on Quanex's press releases as the main point of contact

7

for media, analyst, and investor queries.  Throughout the Class Period, Zuehlke made statements on the Company's earnings calls and at Quanex's February 6, 2025 Analyst/Investor Day and signed the FY 2024 annual report filed on SEC Form 10-K, each quarterly report issued on SEC Form 10-Q, and each press release issued on SEC Form 8-K, which, as alleged herein, violated federal securities laws and contained materially false and/or misleading statements and omissions.

24.    Defendants Wilson and Zuehlke, because of their positions with the Company, possessed the power and authority to control the contents of the Company's Proxy Statement, SEC filings, press releases, and presentations and public statements to securities analysts, money and portfolio managers, and institutional and individual investors—i.e., the market.  Wilson and Zuehlke were provided with copies of the Company's filings, reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Defendants' Goal Was for Quanex to Generate $2 Billion in Annual Revenue, but They Could Not Come Close to Hitting that Level Without a Large Acquisition

25.    Quanex manufactures and sells components primarily for windows, doors, and cabinets.  Its sales are "made-to-order," i.e., customers place orders for components with precise specifications, which Quanex then manufactures.

26.    In September 2022, CEO Wilson, dissatisfied with Quanex's performance, announced plans to dramatically grow the Company and "achieve $2 billion of revenue" annually.  Quanex's revenue was then stuck at about half that level—its FY 2021 revenue was about $1 billion, and its FY 2022 revenue was about $1.2 billion.

27.    Defendants' planned to reach $2 billion in annual revenue through a combination of "organic growth, inorganic growth or growth through innovation."  That is, they planned for

8

customers to increase their orders of Quanex products, and if that did not work, to expand through acquisitions or new product development. Wilson referred to this as Quanex's "Growth with Purpose" or "Bigger" strategy.

28.     This strategy immediately failed. Customers showed no interest in purchasing more of Quanex's products. In FY 2023, Quanex managed revenue of only $1.13 billion, a decline from the previous year. Quanex's revenue continued to fall through the first three quarters of FY 2024. In fact, for each of 1Q 2024, 2Q 2024, and 3Q 2024, Quanex's revenue was lower than the same quarter in FY 2023, and Quanex's revenue was overall down about 6% compared to the previous year.



### B.     To Achieve Their $2 Billion Annual Revenue Goal, Defendants Determined that Quanex Needed to Acquire a Competitor Called Tyman

29.     Desperate to reverse Quanex's performance decline and make progress toward their $2 billion revenue plan, Defendants determined that they needed to undertake an acquisition to gin up growth—a strategy they had fallen back on repeatedly over the previous decade. This time Defendants targeted a relatively large company called Tyman, another manufacturer of window and door components.

9

30.     Notably, if Tyman's $820 million in FY 2023 revenue had been added to Quanex's FY 2023 revenue, Quanex would have essentially hit Defendants' $2 billion goal.

31.     Quanex had considered acquiring Tyman prior to 2024.  In 2018 and 2020, Quanex made offers to acquire Tyman, both of which were at prices that Tyman rejected.

32.     Then, in April 2024, Quanex made an offer that Tyman finally accepted.

**C.     Tyman's Manufacturing Facilities—Especially Its Critical Monterrey Facility—Used Outdated and Poorly Maintained Equipment that Caused Delays, Low-Quality Production, Lost Revenue, and Low Earnings**

33.     In acquiring Tyman, Quanex was in large part acquiring a North American subsidiary of Tyman's named AmesburyTruth.  The bulk of Tyman's facilities and business were in North America, and the AmesburyTruth subsidiary made up almost all of Tyman's North American segment.  By the start of 2024, the AmesburyTruth subsidiary had over 2,800 employees, representing over 75% of Tyman personnel, and accounted for the largest portion of Tyman's revenue.

34.     Importantly, leading up to the acquisition, Tyman's AmesburyTruth manufacturing operations and facilities suffered from longstanding and well known problems within that company and with its customers.  Tyman's AmesburyTruth manufacturing facilities were outdated, falling apart, and poorly maintained.  Thus, these facilities could not keep up with customers' orders, as they produced products too slowly and in poor quality.  Tyman employees who worked at these facilities also regularly suffered injuries and safety issues due to the poor conditions, which further undercut the timeliness and quality of products manufactured there.

35.     These problems were particularly pronounced at Tyman's critical Monterrey Facility.  Part of the AmesburyTruth subsidiary, the Monterrey Facility was a hub that produced a variety of window and door components for other Tyman facilities, which then sold those components to customers or combined them with other materials to make more complex products.

10

Late and poor quality manufacturing from the Monterrey Facility therefore reverberated throughout and harmed Tyman's entire operations.  Underscoring the Monterrey Facility's importance and problems, Tyman's board visited it in 2023 to meet with frontline employees who shared their experiences working there.  Out of 29 Tyman manufacturing facilities, this was one of a handful of facilities the Tyman board visited.

36.     One of the Tyman sites that depended on and was negatively impacted by the Monterrey Facility's poor operations was its facility in Statesville, North Carolina (the "Statesville Facility").  The Statesville Facility was also an important Tyman facility that was among the handful of facilities the Tyman board visited in 2023.  In addition to manufacturing products, the Statesville Facility sold components directly to customers and lost sales due to the problems at the Monterrey Facility.  Moreover, the Statesville Facility, which was also operated by the AmesburyTruth subsidiary, suffered from some of the same operational problems as the Monterrey Facility.

37.     The deeply engrained problems at the Monterrey Facility, the Statesville Facility and Tyman's other AmesburyTruth facilities were negatively impacting Tyman's performance. For example, due to slow manufacturing, orders were not fulfilled on a timely basis, resulting in backlogs and customer cancellations.  Also, owing to inefficient and low quality manufacturing, Tyman had to waste money remaking components that customers ordered or outsourcing their production to third parties.  All of this depressed Tyman's revenue, margins, and profits.

38.     Multiple former employees ("FEs") of Quanex, and in most cases Tyman too, recounted the well-known problems at the Monterrey Facility and other Tyman AmesburyTruth facilities prior to the acquisition and throughout the Class Period.

39.     FE1 worked as a Senior Process Engineer at the Monterrey Facility from January

11

2024 through September 2024—that is, from prior to Quanex's acquisition of Tyman, to after Tyman became a part of Quanex pursuant to the acquisition. FE1's responsibilities included overseeing engineering at the Monterrey Facility and attempting to reduce backorders. This often involved FE1 overseeing the Monterrey Facility's 17 presses, which used materials such as aluminum and steel to generate components used in coils, locking mechanisms, stop blocks, and other fenestration parts. The presses at the Facility were both manual and automatic—manual presses involve cycling out parts of the press manually. FE1 reported directly to the Monterrey Facility's manager.

40. During FE1's tenure at Tyman and later Quanex, FE1 recalled that the Monterrey Facility's manufacturing machinery was both outdated and suffered from a lack of maintenance, leading to machine failures. As FE1 explained, similar to a car, presses required monthly and annual preventive maintenance, including lubrication and system checks, to function properly. But FE1 recounted that such maintenance was often not performed.

41. The outdated and poorly maintained machinery led to production problems at the Monterrey Facility. FE1 recalled that the Vice President of Hardware at the AmesburyTruth subsidiary was able to view the plant's performance data in the SAP system—which contained information on staff hours, inventory, raw materials, scrap, and other plant operational information, as well as weekly and monthly targets and the number of staff hours corresponding with the number of parts manufactured.

42. FE1 continued that, around March 2024, this Vice President requested that security cameras be installed at the Monterrey Facility and pointed at three presses—press numbers 11H, 11C, and 11G—to enable even stronger monitoring, because the performance data indicated that the Monterrey Facility's presses were producing components at an insufficient level. Also during

12

FE1's tenure, FE1 recalled that this Vice President ordered those three presses to run 24 hours per day, seven days a week, but was informed by FE1's superiors that the Monterrey Facility did not have the personnel, raw material, or properly functioning machinery to sustain that pace of work.

43.    As a result of the maintenance and production problems, FE1 recounted orders at the Monterrey Facility were delayed and fell into backlog.  For example, FE1 described a window component the Monterrey Facility made (called a "snubber") that fell into backlog at least two or three times during FE1's tenure.

44.    Exacerbating the production problems, and illustrating the poorly maintained machinery, the Monterrey Facility also suffered notable safety incidents.  FE1 recalled incidents where workers at the Monterrey Facility were injured.  For instance, in January or February 2024, when an employee at the plant broke his leg on a press, the Monterrey Facility's Manager removed the injured employee "out a back door" and took him to the hospital.

45.    FE2 confirmed the Monterrey Facility's problems with outdated machinery, poor production, and the resulting backlog.  FE2 was employed as a Supply Chain Manager at the Statesville Facility from October 2023 to September 2024—again, from prior to the acquisition to after the acquisition closed.  In that role, FE2 oversaw purchasing and planning functions.  A large percentage of FE2's responsibilities involved coordinating with the Monterrey Facility, which supplied products to the Statesville Facility.  FE2 reported directly to Tyman's Director of Supply Chain and to the Statesville Facility's Manager.

46.    During FE2's tenure, "the Monterrey location was a shitshow," and from a supply chain perspective was the most "disconnected and unorganized and shady" facility that FE2 had worked with.  FE2 stated that the Monterrey Facility was a "persistent" and "well-known operational problem" within AmesburyTruth, when it was part of Tyman and then later Quanex.

13

From FE2's first day of employment onward, FE2 encountered significant issues with Monterrey's production, communication, and accuracy.  FE2 also learned that these were longstanding issues dating back to before FE2 began working at Tyman, with longtime AmesburyTruth employees informing FE2 that the Monterrey Facility "was a nightmare."

47.     As FE2 recounted, the Monterrey Facility had significant issues with its machinery and equipment.  FE2 learned of those issues from communications with counterparts in Monterrey and at a Tyman facility in Texas and from the fact that the Statesville Facility consistently received fewer products from the Monterrey Facility than it was supposed to.  When FE2 questioned why the Statesville Facility had not received the correct and sufficient amount of products it had ordered, FE2 was told that the Monterrey Facility's machines were not working.

48.     In addition, FE2 recalled that the Monterrey Facility had significant problems with the quality of the products it produced.  FE2 witnessed incoming products from the Monterrey Facility that were often defective, failing integrity tests performed at the Statesville Facility, and even appearing rusty.  FE2 added that she believed the Monterrey site performed integrity tests at their location as well, although she "didn't understand it because we always got junk."

49.     Further, the Monterrey Facility routinely produced and shipped less product than the Statesville Facility forecasted or expected.  FE2 explained that the Statesville Facility supplied the Monterrey Facility with raw materials, and that the Monterrey Facility was then supposed to send back a specific amount of product.  The Statesville Facility particularly depended on coils produced by the Monterrey Facility—coils were an essential component of windows that could not be substituted with other parts—and to satisfy its customers' orders the Statesville Facility needed to include coils produced by the Monterrey Facility, FE2 added.  However, FE2 continued, the amount of finished products returned from the Monterrey Facility were consistently far below

14

what the Statesville Facility requested and below the corresponding amount of raw material, such as expensive metals, that the Statesville Facility had provided for the order. For example, FE2 recalled instances where the Statesville Facility sent enough raw material for 20,000 coils and received only 6,000 coils in return.

50.     Owing to these problems with the Monterrey Facility, FE2 recounted that the Statesville Facility was unable to make reliable production plans and forecasts, which resulted in delayed shipments and customers cancelling orders. FE2 noted that coil delays stemming from problems with the Monterrey Facility could last six to eight weeks, leading customers to view AmesburyTruth as unreliable. In turn, FE2 stated that customers of the Statesville Facility cancelled not only orders for coils, but also cancelled orders for other products such as foam, urethane, and Tyman's G2 line of sealing materials for windows—one of Tyman's major products. Customer cancellations included large orders worth six figures, FE2 noted, forcing management to try to prioritize the largest accounts when these backlogs occurred.

51.     FE2 recalled that management attempted to limit cancellations and delays stemming from failures at the Monterrey Facility by having the Statesville Facility and another Tyman facility work overtime manufacturing extra products, or outsourcing extra manufacturing to third parties. But this did not stop the delays and cancellations, FE2 stated, because the problems at the Monterrey Facility continued. As such, FE2 stated that the Statesville Facility would sometimes place smaller orders than it needed with the Monterrey Facility, to try to ensure that it at least received some products on a timely basis. For instance, because the Monterrey Facility failed to meet quality or quantity standards when it attempted to produce multiple coil sizes at the same time, the Statesville Facility often had to request just one size of coils at time, even when customers were demanding multiple sizes.

15

52.    On top of the customer cancellations, FE2 added that the Monterrey Facility's issues negatively impacted profitability at the Statesville Facility.  FE2 explained that metal was one of the most expensive inputs in window manufacturing, and the Monterrey Facility's inefficiency and quality failures eroded margins.  Moreover, FE2 continued, customers were frequently dissatisfied and demanded discounts, such that sometimes the Statesville Facility did not break even on orders due to the delays and defective products.

53.    FE2 repeatedly raised issued about the problems with the Monterrey Facility at regular monthly Sales and Operations meetings that occurred throughout FE2's tenure.  FE2 stated that these meetings included the CEO of AmesburyTruth North America, and other high ranking Vice Presidents throughout the company from areas including sales, supply chain, demand planning, customer service, and product development.

54.    Also, FE2 recounted that facilities throughout the AmesburyTruth subsidiary generally had problems like those at the Monterrey Facility, because AmesburyTruth needed to make major investment in machinery and equipment which it failed to do.  FE2 stated that equipment issues were a problem "across the board" and were "a huge burden in every plant" at AmesburyTruth.  For example, FE2 explained that much of the machinery in the Statesville Facility, and another AmesburyTruth facility located in Sioux Falls, South Dakota, was approximately 60 years old.  This old equipment required constant maintenance and improvisation to keep running, FE2 added, and in some cases replacement parts were no longer manufactured due to the age of the machinery or management had to hire outside specialists to help repair it.

55.    FE2 recalled that between May and September 2024—from the lead up to the acquisition to several months after it closed—the Director of Operations at the AmesburyTruth subsidiary spent extensive time traveling to the Monterrey and Sioux Falls facilities, often visiting

16

the Monterrey Facility once or twice a month. As FE2 noted, "these locations were the problem children with output."

56.     FE3 also confirmed the issues with older machinery, production slowdowns, and order backlogs. FE3 was employed at the Statesville Facility as Supply Chain Specialist from November 2023 to January 2025—from before the acquisition, to after the acquisition closed. FE3 was responsible for scheduling production, and oversaw six departments, each containing approximately three production lines and machines, including Statesville's main products, including coils and window seals. In that capacity, FE3 reported to the Director of Operations at the AmesburyTruth subsidiary. Problems at the Monterrey Facility impacted the Statesville Facility and FE3's work scheduling production there. Thus FE3 learned of significant problems at the Monterrey Facility through the course of carrying out that work.

57.     Throughout FE3's tenure, FE3 recalled that the Monterrey Facility was widely known as a source of ongoing problems among staff at the Statesville Facility. FE3 continued that problems at the Monterrey Facility were a frequent topic of discussion among staff at the Statesville Facility, citing the fact that FE3 frequently overheard the engineering team's meetings. FE3 noted that the primary product affected by production issues at the Monterrey Facility were window support coils, which were one of the main products manufactured there.

58.     FE3 added that the machinery at the Statesville Facility was also extremely old and prone to breakdowns. As FE3 recounted, some machines there were so outdated that replacement parts were no longer manufactured, and one machine had been down for years before an engineer was able to get it running again.

17

59.    In turn, FE3 explained that when a machine went down, the associated product line could not be produced at all.  This was because each machine was designed to manufacture a specific type of product.

60.    The production problems at the Monterrey and Statesville Facilities led to order backlogs and triage among its customers.  For example, FE3 recalled that the Monterrey Facility frequently had to ask the Statesville Facility to produce large amounts of products with an unrealistic production timeframe.  In turn, FE3 explained that such requests from the Monterrey Facility slowed down and at times completely stopped the production of existing customer orders at the Statesville Facility, resulting in delayed shipments to those customers.  Further, because these requests and slowdowns created order backlogs for the Statesville Facility, FE3 recounted that it forced the Statesville Facility to "pick and choose" which customer orders it would address first and which customers had to wait for products.  Exacerbating this problem, it could take hours to changeover a production line that was already manufacturing one type of component for the Statesville Facility's customers so that it could manufacture a differing component for the Monterrey Facility, and hours more to switch the production line back later on.  FE3 noted that these issues began prior to the Quanex acquisition.

61.    FE3 recounted that the various problems with the Monterrey Facility were raised in forecasting meetings at the Statesville Facility.  The meetings addressed customer order and production planning, and were attended by personnel from finance, plant management, buyers, and scheduling.  FE3 stated that these meetings occurred throughout FE3's tenure, either biweekly or monthly.

62.    FE4 also confirmed the issues with older machinery, production slowdowns, and order backlogs.  FE4 worked at the Statesville Facility as a Training and Development Specialist

18

from May 2017 to November 2024—before the acquisition to after the acquisition was complete. FE4 was responsible for training employees on how to perform manufacturing jobs. This included training Statesville employees on the floor which manufactured products that included those sent to Monterrey. In carrying out her responsibilities, FE4 reported to the Manager of the Statesville Facility.

63.　FE4 recounted both the Monterrey and Statesville Facilities had issues with older machinery while FE4 worked at Tyman and then Quanex, and these issues were well known. As FE4 explained, some of these machinery issues caused shutdowns, which happened about once a month and could cause a production line to stop for as long as a whole shift or a whole day. FE4 understood that these shutdowns were caused by machinery needing upgrades. About midway through FE4's tenure, FE4 tried to address some of the machinery issues. FE4 believed that both the President of AmesburyTruth North America and the Statesville Facility were aware that the machinery problems were causing shutdowns.

64.　FE4 confirmed that the shutdowns pushed back production and, in turn, caused a backlog on customer orders at AmesburyTruth. FE4 "used to hear a lot" about this backlog, as it existed throughout FE4's tenure. Further, FE4 explained, that part of the backlog was caused by manufacturing issues not just at the Monterrey Facility, but by similar issues at the Statesville Facility.

65.　FE4 added that safety issues, such as from machines, increased the backlog, and that when a major incident happened on a specific line, it could shut the line down for a day or two. Over the last two to three years of FE4's tenure, preventative maintenance were performed once a week on a rotating basis on certain production lines to try to address these issues and because the machines were older and needed the maintenance to keep running. This added to the

19

backlog, FE4 explained, because machines had to be shut down for maintenance even if they were then in use.

66. FE4 recalled that the Statesville Facility's Manager was involved in "a lot of meetings" where issues regarding the ongoing backlog as well as the production issues at the Statesville and Monterrey Facilities were discussed. These meetings also included production managers, quality managers, and a few engineers. FE4 was aware of these meetings because if any need for additional training arose from them, FE4 was informed and then provided training to make sure employees on the production floor understood the workflow and instruction. FE4 was sure that the President of AmesburyTruth North America was aware of the ongoing issues, because the Statesville Facility Manager reported to him. The President of AmesburyTruth North America would also visit the facilities, including visiting Stateville "quite a few times," and stay for a day or two.

**D. Prior to the Acquisition, Defendants Conducted Extensive Due Diligence into Tyman, Including Its Critical and Poorly Performing Manufacturing Facilities**

67. As a condition of pursuing the acquisition, Quanex's Board required Defendants to conduct extensive due diligence into Tyman, including its core manufacturing functions. Defendants began their due diligence by September 2022—and they already had familiarity with Tyman based on their previous attempts to acquire it. Defendants' investigation of Tyman continued on and off over the next 20 months until April 2024.

68. When Defendants announced that Quanex had agreed to acquire Tyman for $1.1 billion on April 22, 2024, they emphasized that, based on their due diligence, "we have mapped out the global manufacturing locations between the two companies," and displayed a slide showing, among other facilities, the Monterrey Facility. Zuehlke explained that, "based on the diligence performed leading up to today's announcement, we've undertaken a preliminary

20

operational review of and developed an integration plan for the combined business." This confirmed that Defendants investigated the operations of Tyman's manufacturing facilities, including at Monterrey.

69.     Analysts accepted and responded positively to these statements regarding Defendants' due diligence and plan to expand Quanex's manufacturing facilities by adding Tyman. For example, Benchmark, in its April 23, 2024 report, praised Quanex's "Improved Geographic Penetration" upon the integration of "Tyman's 10 North American manufacturing facilities [which] support nearly two thirds of the company's [Tyman's] existing business."

70.     Defendants subsequently provided additional detail regarding their investigation of Tyman leading up to the acquisition. This included senior Quanex executives receiving broad information about Tyman's business and "access to Tyman senior management to help Quanex quantify potential synergies and diligence management forecasts." Further, "Quanex and its advisors engaged in an extensive financial, legal and regulatory due diligence process with Tyman and its advisors, including numerous conference calls on due diligence."

### E.     Defendants Issued a False and Misleading Proxy Statement in June 2024 Soliciting Approval of the Tyman Acquisition from Quanex's Shareholders, Which Was Granted in a July 2024 Vote

71.     Under SEC regulations, Quanex, as a publicly traded company, had to obtain shareholder approval for the Tyman acquisition, because Defendants were proposing to pay for Tyman by issuing common stock worth over 20% of Quanex's then outstanding shares. The vehicle for requesting shareholder support is a "Proxy Statement," circulated to shareholders and filed with the SEC.

72.     Defendants issued a Proxy Statement on June 6, 2024, soliciting approval from Quanex shareholders for the Tyman acquisition. This Proxy Statement provided a description of Quanex and Tyman's businesses, and the planned combined company.

21

73. However, the Proxy Statement contained false and misleading statements. Among other things, the Proxy Statement touted Tyman's manufacturing capabilities and operations, and claimed that Quanex did not face significant dis-synergies or additional operational costs from Tyman's manufacturing facilities.

74. The Proxy Statement set a July 12, 2024 deadline for Quanex shareholders to vote on the acquisition. After the market closed on July 12, 2024 Defendants announced that Quanex's shareholders had approved the acquisition.

75. The acquisition closed on August 1, 2024, with Tyman then merging into Quanex.

**F.   After the Acquisition Closed, the Poor Production, Customer Backlogs, and Cancellations at the Legacy Tyman Facilities Continued, Harming Quanex**

76. Once the acquisition closed, Defendants immediately conducted a further investigation into Tyman's poorly performing manufacturing facilities. On Quanex's September 6, 2024 earnings call, Wilson explained that, "once the deal was finalized, we hit the ground running by continuing to work closely with our integration consultants, while also engaging with the legacy Tyman team . . . and we are working quickly to establish a new organizational structure[.]" Zuehlke added that this included "performing a full physical inventory count at all legacy Tyman manufacturing plants prior to our fiscal year-end on October 31[, 2024]."

77. The deeply engrained problems at the Monterrey Facility, the Statesville Facility, and other legacy Tyman facilities continued to run rampant after the acquisition closed and those facilities merged into Quanex.

78. FE5 confirmed that the Monterrey Facility had outdated machinery, insufficient production, backlog orders, and safety issues when Tyman ran the Facility and that these issues continued after Quanex acquired it. FE5 worked at Quanex from 2019 to June 2025, originally as a Plant Manager before receiving a promotion to Director of Operations. In January 2025, after

22

the acquisition, Quanex tasked FE5 with overseeing the Monterrey Facility.  In that capacity, FE5 made weekly trips to the Monterrey Facility.  FE5 reported to Quanex's Vice President of Operations.

79.    In particular, FE5 was tasked with fixing ongoing issues at the Monterrey Facility. FE5 had previously been tasked with fixing or relocating other Quanex manufacturing facilities.

80.    FE5 recounted that dating back to when Quanex acquired the Monterrey Facility, the Facility along with its employees were overwhelmed and over-capacity.  In addition to an employee shortage, FE5 continued that the Monterrey Facility had issues with its machinery and tools, because underinvestment by Tyman had left them outdated and unable to operate at full capacity.

81.    Thus, FE5 explained that the Monterrey Facility "could only run so much in 24 hours," while it also had "to do maintenance."  As an example, if an injecting tool is supposed to be able to handle 50 pieces per injection, the outdated tools at the Monterrey Facility could only handle 20 pieces.  FE5 recounted that there was not enough money invested to buy new tools and get production back up to 50 pieces and believed that Tyman had been "holding back money."

82.    As a result of these production problems, when FE5 began working at the Monterrey Facility, FE5 noticed "right away" that it had a backlog with customers of about $2 million.  This backlog dated back to when Tyman owned the Monterrey Facility, and FE5 explained that the facility "was poorly managed under Tyman."

83.    But FE5 recounted that even after Quanex acquired the Monterrey Facility, product still was not moving fast enough from there to Quanex's other facilities that depended on Monterrey.  To that point, in December 2024, FE5 had a conversation with a representative from Andersen Windows, a customer of Quanex and previously Tyman, who recommended to Quanex

23

that FE5 try to fix the well-known issues at the Monterrey Facility. But the representative warned FE5 with regard to the Monterrey Facility, "you're screwed."

84.    FE5 recalled that after taking over the Monterrey Facility, Quanex invested money into the Facility to try to fix the foregoing problems. When FE5 started making weekly trips to the Monterrey Facility, FE5 tried to address those problems too. But FE5 and Quanex's progress was slowed down by the integration and because Quanex had not decided which Tyman personnel would remain at the Monterrey Facility and who needed to be replaced. So, it took FE5 some time just to get a team in place to start handling the issues. In the interim, FE5 recalled that Quanex had to take costly measures, like bringing in third-parties to help with die casting, to try to improve production at the Monterrey Facility.

85.    Further, to attempt to make up for lost time and reduce the backlog, FE5 recalled that Quanex was spending $140,000 per month to airfreight products from the Monterrey Facility to other facilities in the United States. While this reduced the Monterrey Facility's backlog somewhat, a significant backlog remained by the time FE5 left Quanex, and the backlog actually started to increase again.

86.    In addition to the backlog, FE5 recounted that as a result of the underinvestment in the Monterrey Facility, it also had failed to comply with Occupational Safety and Health Administration ("OSHA") standards. FE5 stated that employees were suffering injuries at the Monterrey Facility dating back to the Tyman era and continuing after Quanex took over.

87.    In addition FE1, FE2, FE3, and FE4 confirmed that the problems they described above—such as outdated machinery, poor production, and backlogs at the Monterrey, Statesville and other legacy Tyman Facilities—continued after Quanex acquired Tyman. FE1 also recalled in July 2024, around the time that shareholders approved the acquisition, that one of the Monterrey

24

Facility's presses failed due to engine and grounding issues. A maintenance technician admitted to FE1 that the press had not received annual maintenance in years because it was "too expensive," which was confirmed to FE1 by a more senior technician after FE1 escalated concern about the press. And FE3 also noted that the Monterrey Facility's unrealistic production requests to the Statesville Facility, and the Statesville Facility's resulting backlogs, escalated in the summer of 2024.

G.    **Defendants Made False and Misleading Statements Touting Quanex's and Legacy Tyman's Manufacturing Throughout the Class Period**

88.    Though the deep problems at the legacy Tyman facilities persisted after the acquisition closed and were negatively impacting Quanex, Defendants made false and misleading statements concealing them throughout the Class Period. Among other things, they touted Quanex's and legacy Tyman's strong manufacturing capabilities, which were purportedly a boon to Quanex's performance and EBITDA. Defendants further claimed that the combined Company's and legacy Tyman's operations were excellent, were not disrupting customers and were enjoying record safety. Defendants made these statements in SEC filings, earnings calls, and at an analyst/investor day conference.

H.    **In September 2025, Defendants Finally Disclosed the Truth—that the Monterrey Facility Was Performing Poorly, Causing Backlogs, and Required Expensive Fixes—Which Caused Quanex's Stock to Plummet**

89.    On September 4 and 5, 2025, in an earnings release and follow up conference call, Defendants finally disclosed the Monterrey Facility's longstanding and substantial problems and their negative impact on Quanex. Defendants admitted that Quanex had been suffering "operational challenges related to the legacy Tyman window and door hardware business in Mexico," specifically the Monterrey Facility. They conceded that Quanex's priority "is fixing Monterrey and getting that solved[,]" which entailed "upgrading the facility's capabilities,

25

processes and equipment to Quanex standards," "putting systems in place," and "spending money on assets[.]"

90. Further, Defendants admitted that, with respect to the Monterrey Facility's problems, these were "operational issues we inherited" from Tyman. They continued that Tyman's operations were "not up to the standards" of Quanex, and had gotten "to a point where if you're not maintaining tools and equipment, but you continue to try to run and you block off cavities, then it creates quality problems and other issues, and it will eventually catch up to you." Put simply, "we were underinvested and that the tooling condition and the equipment condition was not where we wanted to be, and it was not going to be healthy to support our customers. So we had to make some changes and fix some things before it was catastrophic."

91. As a result of these problems, which "impact[ed] backlog and lead[] to inefficiencies and increased costs[,]" Quanex reported poor adjusted EBITDA for the just ended quarter, 3Q 2025, and indicated that adjusted EBITDA would similarly be impacted the next quarter, 4Q 2025. Further, Defendants reduced Quanex's FY 2025 revenue and EBITDA guidance.

92. In turn, Quanex's common stock price fell over 13% on Friday, September 5, 2025, and another 11% on Monday, September 8, 2025. In total, this erased about $218 million in shareholder value.

## V. FALSE AND MISLEADING STATEMENTS IN VIOLATION OF EXCHANGE ACT §14(A)

### A. The Proxy Claims

93. The Proxy Claims do not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme, or intentional conduct as part of their Proxy Claims. Any allegations of fraud, fraudulent conduct, or motive are specifically disclaimed from the

26

following allegations for the purposes of the Proxy Claims, which do not have scienter, fraudulent intent, or motive as required elements. To the extent that these allegations incorporate factual allegations elsewhere in this Amended Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiffs or members of the Class.

94.    Defendants participated in the preparation, review and dissemination of the materially misleading Proxy Statement complained of herein—detailed in §V.B below. Defendants abdicated their duty to file and distribute to Plaintiffs and the Class a Proxy Statement that was not misleading. Accordingly, the Defendants violated §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

95.    As a direct result of the Defendants' negligent preparation, review, and dissemination of the false and/or misleading Proxy Statement, which was used to obtain shareholder approval of the Tyman acquisition, Plaintiffs and the Class were deprived of their right to a fully informed shareholder vote in connection with that acquisition. Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy Statement, which Defendants used to obtain shareholder approval of and thereby consummate the acquisition, Plaintiffs and the Class have suffered damage and actual economic losses in an amount to be determined at trial.

**B.    The Proxy Statement's False and Misleading Claims**

96.    On June 6, 2024, Defendants issued the Definitive Proxy Statement on Schedule 14A—the Proxy Statement. The Proxy Statement contained the materially false statements and omissions, and failed to disclose all the material facts necessary to make those statement not misleading, as set forth below.

97.    *First*, the Proxy Statement made false or misleading statements claiming that due

27

to its manufacturing capabilities, the acquisition of Tyman enhanced Quanex's overall manufacturing, performance, and ability to serve customers. For example, the Proxy Statement claimed that "the acquisition by Quanex of Tyman offers a unique opportunity to create a leading supplier of components to OEMs [original equipment manufacturers] in the building products sector globally[,]" because "[t]he Enlarged Group will: . . . *capitalize on expanded engineering, design and manufacturing capabilities*."

98. The Proxy Statement also claimed that, "the Transaction presents an opportunity for Quanex to execute on its 'BIGGER' strategic roadmap for growth and value creation and represents an opportunity to create a comprehensive solutions provider in the building products industry, leveraging the complementary product portfolios of trusted brands and *expanded engineering, design and manufacturing capabilities* of both groups to deliver value to consumers, shareholders and other stakeholders."

99. But the statements in ¶¶97-98 above were materially false or misleading, because Quanex could not "leverag[e]" or "capitalize on" Tyman's "engineering, design and manufacturing capabilities[.]" To the contrary, Tyman's facilities were systematically outdated, poorly maintained, and understaffed. Thus those facilities did not reliably or efficiently manufacture products, leading to customer backlogs, cancelled orders, and high costs. These problems were particularly pronounced at Tyman's critical Monterrey Facility. As a result, acquiring Tyman actually degraded Quanex's manufacturing capabilities, and prevented Quanex from "deliver[ing] value to consumers, shareholders and other stakeholders." Moreover, the substantial manufacturing problems at the Monterrey Facility, and Tyman's other facilities, along with the extensive time and money required to fix them, undercut Quanex's growth and earnings.

100. *Second*, the Proxy Statement made false or misleading statements touting Quanex's

28

and Tyman's operations, and the combined company's ability to maintain operational excellence even through the integration. For instance, it claimed that "[d]uring the implementation of the integration plan, *Quanex will place a strong focus on maintaining operational excellence* and minimizing any disruption to customers."

101.    However, the statement in ¶100 above was materially false and misleading, because the legacy Tyman facilities, and especially the critical Monterrey Facility, did not have "operational excellence" to maintain. In truth, legacy Tyman facilities had poor operations—their outdated machinery and equipment had fallen into disrepair, and they were understaffed. As a result, the operations of legacy Tyman facilities were already regularly resulting in low quality products, customer backlogs and cancelled orders. Not only were the legacy Tyman facilities unreliable, they were also unsafe, and commonly caused workers injuries. All of these operational failures reduced revenue and increased costs at the legacy Tyman facilities. Moreover, attempting to fix these problems during the integration entailed millions of dollars in additional expense to Quanex and even more disruptions for customers.

102.    *Third*, the Proxy Statement made false or misleading claims about dis-synergies—increased operational costs—from Quanex's acquisition and integration of Tyman. The Proxy Statement claimed that "*[p]otential areas of dis-synergy expected to arise in connection with the Transaction have been considered and were determined by the Quanex Directors to be immaterial for the analysis*."

103.    But the statement in ¶102 above was materially false or misleading, because Quanex faced significant increased "dis-synergies" and costs from having to operate and fix the legacy Tyman facilities' outdated, poorly maintained, and unsafe machinery. Manufacturing products at legacy Tyman facilities was already more expensive than the Proxy Statement

29

indicated, due to the frequent shutdowns, slow operations, and need to outsource manufacturing or replace low quality work. Moreover, due to the legacy Tyman facilities' problems with customer backlogs and cancellations, Quanex could not always recoup those high costs, resulting in poor earnings. On top of that, fixing the substantial problems at the legacy Tyman facilities, and especially the Monterrey Facility, cost Quanex substantial time and millions of additional dollars.

104. *Fourth*, the Proxy Statement made false and misleading risk disclosures. For example, the Proxy Statement presented the following as a hypothetical scenario:

> ***Loss of competitive advantage could negatively impact Tyman's profitability.***
>
> ***Loss of competitive advantage may adversely affect Tyman's financial performance or reputation in the short to medium term. Tyman's ability to maintain its competitive advantage is based on a wide range of factors including the strength of Tyman's brands, the breadth and depth of its portfolio, the level of quality and innovation reflected in its products, its supply chain flexibility, its excellent customer service and technical support, and the depth of customer relationships it nurtures, all supported by fair and competitive pricing. Failure to perform on any one of these aspects may lead to erosion of competitive advantage overtime, and in turn to loss of customers to competition.***

105. Likewise, the Proxy Statement presented the following as a hypothetical scenario, incorporated by reference from Quanex's 10-K for FY 2023:

> ***Equipment failures or catastrophic loss at any of our manufacturing facilities could prevent us from producing our products.***
>
> ***An interruption in production capabilities at any of our facilities due to equipment failure, catastrophic loss, or other reasons could result in our inability to manufacture products, which could severely affect delivery times, return or cancellation rates, and future sales, any of which could result in lower sales and earnings or the loss of customers.***

106. Again, the statements in ¶¶104-05 above were materially false or misleading because these risks were not hypothetical, rather they had in fact materialized. Tyman was already "fail[ing]" to provide "quality" products and "excellent customer service," due to the poor

performance at the Monterrey Facility and its other facilities, which was causing backlogs, customers cancellations, and undercutting profitability.  And the Monterrey Facility and legacy Tyman facilities were already suffering "interruption[s] in production capabilities" and "equipment failure[s]," that were "affect[ing] delivery times" by causing delays and increasing customer "cancellation rates," which "result[ed] in lower sales and earnings."

## VI.  FRAUDULENT STATEMENTS IN VIOLATION OF EXCHANGE ACT §10(B)

### A.  Defendants' False and Misleading Statements

107.    From June 6, 2024 through the end of the Class Period, Defendants made materially false statements and omissions, and failed to disclose all the material facts necessary to make the statement not misleading, in SEC filings, earnings calls, and at presentations and meetings with analysts and investors.  Those statements are set forth below.

108.    *First*, Defendants made false and/or misleading statements and omissions claiming that Quanex's combined manufacturing capabilities, and its manufacturing capabilities from the legacy Tyman facilities, ensured strong performance, safety, and ability to serve customers.  This included Defendants' claims in the Proxy Statement set forth in ¶¶97-98 above.

109.    Similarly, on Quanex's December 13, 2024 earnings call for 4Q 2024, Wilson emphasized that Quanex is "*a manufacturing company that has a broad set of core competencies[,]*" and that adding Tyman allowed Quanex to "*think much bigger than we currently are and it gives us the opportunity to really build off of what is a strength of Quanex, and that's our manufacturing capabilities.*"  Wilson continued that Quanex was achieving these objectives by, throughout its business, "*combin[ing] some of the legacy Tyman and some of the legacy Quanex*" facilities into bigger operating segments.

110.    Quanex's December 16, 2024, FY 2024 Annual Report filed on SEC Form 10-K likewise claimed that the Quanex "*realize[s] improved profitability in our manufacturing*

31

*processes through*" such actions as "*ongoing preventive maintenance programs*" and "*focusing on employee safety.*"

111. And Quanex's quarterly reports for 1Q 2025 and 2Q 2025, filed on SEC Form 10-Q on March 11 and June 6, 2025 respectively, claimed that the Quanex "*leverage[d] efficient production and distribution processes and engineering expertise to provide our customers with specialized products*" and that "*these capabilities enhance our ability to provide value to our customers.*"

112. But the statements in ¶¶108-11 above were materially false or misleading, because the Tyman acquisition was not "building" on strong "manufacturing capabilities." To the contrary, the systematically outdated and understaffed legacy Tyman facilities did not reliably or efficiently manufacture products, leading to customer backlogs, cancelled orders, and high costs. These problems were particularly pronounced at Tyman's critical Monterrey Facility, which by itself required millions of dollars to fix. As a result, acquiring Tyman actually degraded Quanex's manufacturing capabilities, and meant that those capabilities were not "improv[ing] profitability" or "provid[ing] value to our customers."

113. *Second*, Defendants made false or misleading statements and omissions touting Quanex's combined operational excellence, and the operational excellence of the legacy Tyman facilities, which ensured strong safety, performance and customer service, including through the integration. This included Defendants' claims in the Proxy Statement set forth in ¶100 above.

114. Similarly, on Quanex's September 6, 2024 earnings call for 3Q 2024, Wilson claimed, with regard to Tyman that, "*[o]ne of the things that we identified fairly early, the cultures are very similar on things that are extremely important to us, how we serve our customers . . . the focus on safety, our willingness and anxiousness to develop people. All of*

*those things are extremely similar.*"

115.   Also, on Quanex's December 13, 2024 earnings call for 4Q and FY 2024, Wilson claimed that, "*[f]rom an operational standpoint, the Quanex team continues to perform exceptionally well, with the focus on the integration of Tyman and the pursuit of ongoing capacity and margin optimization projects.*"

116.   At Quanex's February 6, 2025 Analyst/Investor Day conference and presentation, Zuehlke further highlighted ongoing factors under Defendants "*control*", in particular "*safety culture, operational excellence and working capital management.*"  He also explained that these factors benefitted Quanex's "*EBITDA.*"

117.   Likewise, on Quanex's March 11, 2025 earnings call for 1Q 2025, Wilson claimed:

> *Operationally, I'm very pleased with our performance and the improvements we've already seen as part of the integration process. We achieved record safety performance in the first quarter, along with improvements in service and quality metrics. These gains are the results of sharing best practices between the legacy Quanex and Tyman teams as well as the benefit of migrating to our new operating segments.*
>
> *Moving forward, our operational focus will remain on safety culture, employee engagement, working capital improvements, and optimizing return on net assets to maximize our cash flow generation. . . . So in summary, while short-term market headwinds persist, the Quanex team continues to perform well and the anticipated benefits of the Tyman acquisition are coming to fruition as we expected.*

118.   And on Quanex's June 6, 2025 earnings call for 2Q 2025, Wilson claimed, "*[t]he Quanex team continues to execute at a high level, which has resulted in excellent safety performance as well as delivering better than anticipated synergies.*"

119.   The statements in ¶¶113-18 above were, however, false or misleading because Quanex, and the legacy Tyman facilities, were not "perform[ing] exceptionally well" from an "operational standpoint," particularly not as they undertook the "integration."  In truth, the legacy Tyman facilities had poor operations—their machinery and equipment was in disrepair, they were

33

understaffed. This was harming Quanex's "service and quality," as the legacy Tyman facilities were manufacturing low quality components that customers did not accept, were suffering from large backlogs, and were facing customer cancellations. And, far from a "safety culture," the outdated legacy Tyman facilities had poor safety standards and commonly injured workers. Moreover, attempting to fix the foregoing problems—which were especially severe at the Monterrey Facility—during the integration entailed millions of dollars of expense, harming Quanex's "cash flow generation."

120. *Third*, Defendants made false or misleading claims about dis-synergies, that is increased operational costs, from Quanex's acquisition and integration of Tyman. This included Defendants' claim in the Proxy Statement set forth in ¶102 above.

121. In addition, on Quanex's September 6, 2024 earnings call for 3Q 2024, an analyst asked whether there were "any dis-synergy risks," and noted as an example "any customers that maybe don't want to get overly exposed to one supplier?" In response, Wilson claimed, "*I don't see any initial dis-synergy*."

122. However, the statements in ¶¶120-21 above were materially false or misleading, because Quanex had substantial "dis-synergies" and increased costs from having to operate and fix the legacy Tyman facilities' outdated, poorly maintained, and unsafe machinery. Manufacturing products at legacy Tyman facilities was already more expensive than Defendants indicated, due to the frequent shutdowns, slow operations, and need to outsource manufacturing or replace low quality work. And, owing to the legacy Tyman facilities' problems with customer backlogs and cancellations, Quanex could not always recoup those high costs, resulting in poor earnings. Addressing the substantial problems the Monterrey Facility alone also cost Quanex substantial time and millions of additional dollars, which further undercut its growth, margins, and

earnings.

123.    *Fourth*, Defendants made false or misleading risk disclosures.  Quanex's 10-Q for 3Q 2024 (filed on September 6, 2024), 10-K for FY 2024 (filed on December 16, 2025), 10-Q for 1Q 2025 (filed on March 11, 2025), and 10-Q for 2Q 2025 (filed on June 6, 2025) contained or incorporated by reference the risk disclosure set forth above at ¶105.

124.    The risk disclosures noted in ¶123 above were materially false and misleading because the risks were not hypothetical but had already materialized.  The Monterrey Facility and other legacy Tyman facilities were already suffering "interruption[s] in production capabilities" and "equipment failure[s]," that were "affect[ing] delivery times" by causing delays and increasing customer "cancellation rates," "result[ing] in lower sales and earnings" for Quanex.

### B.    Defendants Made the Fraudulent Statements with Scienter

125.    For the §10(b) claims, multiple grounds establish Defendants' scienter, as set forth below.

#### 1.    Defendants Knew of the Manufacturing Problems at the Monterrey Facility and Other Legacy Tyman Facilities from the Extensive Due Diligence They Performed on Tyman Prior to Acquiring It

126.    By the time Quanex issued the June 2024 Proxy Statement, Defendants had a deep familiarity with Tyman's operations, which were marked by systematic underinvestment, unreliable production and safety problems.  Indeed, Tyman was a manufacturing company, and the manufacturing problems at its main subsidiary, AmesburyTruth, were widely known throughout the company.  As the Proxy Statement itself details, Defendants gained their deep familiarity of Tyman's operations from due diligence they performed leading up to the acquisition—not to mention Quanex's two previous attempts to purchase Tyman in 2018 and 2020.

127.    Defendants began their due diligence and investigation of Tyman for the acquisition during the second half of 2022.  In July 2022, Wilson and Zuehlke met with investment bank

35

Credit Suisse about making another offer to Tyman, and the next month Quanex's Board "authorized an initial preliminary proposal to acquire Tyman, subject to due diligence and definitive documentation."

128. As part of the information about and access to Tyman's operations that Defendants received, over the last four months of 2022, senior officers and executives at Quanex investigated Tyman and held discussions about a possible acquisition with their counterparts at Tyman.

129. In January 2023, Quanex and Tyman called off the negotiations after they were unable to reach an agreement, but by the end of 2023 they resumed negotiations.

130. On January 22 and 24, 2024, Wilson and Nicky Hartery ("Hartery"), Tyman's Chairman, exchanged emails regarding a proposed per share purchase price for Tyman, in which Hartery "offered access to Tyman senior management to help Quanex quantify potential synergies and diligence management forecasts."

131. On February 6, 2024, Wilson and Zuehlke spoke with Tyman's CEO and controller via a video call "in which Tyman provided additional information related to Tyman's projections and outlook as well as possible additional, new information related to potential synergies."

132. On February 27, 2024, Quanex's Board "met and thoroughly discussed the possible acquisition of Tyman."

133. Following a further Wilson-Hartery call, multiple emails in early and mid-March, and the conveyance of a Quanex offer, on March 15, 2024, Hartery emailed Wilson "to confirm that the Tyman Board would unanimously recommend the revised written proposal provided to them on March 14, 2024, subject to mutually acceptable due diligence and definitive documentation."

134. On March 21, 2024, Wilson, Zuehlke, Hartery, and Tyman's CEO met in-person in

to discuss the transaction, and on March 28, 2024 through April 2024, "Quanex and its advisors engaged in an extensive financial, legal and regulatory due diligence process with Tyman and its advisors, including numerous conference calls on due diligence[.]"

135. The Proxy Statement further confirmed the due diligence covered Tyman's manufacturing facilities and operations. It explained that "[p]otential areas of dis-synergy expected to arise in connection with the Transaction have been considered and were determined by the Quanex Directors to be immaterial for the analysis." And the Proxy Statement added that "Quanex's management" had made "[s]trategic plans for Tyman, its directors, management, employees, pensions, research and development and locations" as part of their "operational and strategic review" of Tyman.

136. Quanex and Tyman executed the transaction documents and announced Quanex's acquisition of Tyman to the public on April 22, 2024.

137. On an investor call that same day, Wilson and Zuehlke repeatedly emphasized the due diligence Defendants had undertaken prior to the announcement of the acquisition. For example, Wilson stated that "[w]e have long admired the strong business that the Tyman team has built" and noted that "we have mapped out the global manufacturing locations between the two companies," displaying a slide showing, among other facilities, Tyman's Monterrey location. Zuehlke added that, "based on the diligence performed leading up to today's announcement, we've undertaken a preliminary operational review of and developed an integration plan for the combined business."

138. Moreover, as FE1 noted, owing to Tyman's SAP system which monitored the Monterrey Facility's performance, while Quanex was performing due diligence on Tyman and around the time of the acquisition, a senior executive requested that security cameras be installed

at that Facility because the performance data was poor. FE2 also recalled that during the time leading up to the acquisition, when Quanex was performing due diligence, and after the acquisition closed, a senior executive spent extensive time visiting the Monterrey and Sioux Falls Facilities, which were two of the worst performing legacy Tyman facilities. Tyman's board also visited the Monterrey Facility during the diligence period, one of the few facilities it visited. And, as FE2 recounted, senior management attended regular sales and operations meetings before and after the acquisition at which the problems at the Monterrey Facility were discussed. The substantial problems at the legacy Tyman facilities were well known throughout that company, and Tyman made management available to Quanex and provided Quanex with information regarding its manufacturing facilities during the due diligence process.

139. Further, just after the acquisition closed, on September 6, 2024, Wilson stated that "I think Quanex has been very strong manufacturing-based company, and I think the Tyman team was probably a little more commercial-driven engineered types of solutions." While this did not disclose to investors that there were any problems, let alone substantial problems, with the legacy Tyman manufacturing facilities, in light of the FE allegations and Wilson's admissions at the end of the Class Period, it indicated his and Defendants' awareness of the actual and undisclosed conditions at the Monterrey Facility and other legacy Tyman facilities.

### 2. Defendants Also Learned of the Manufacturing Problems at Monterrey and Other Legacy Tyman Facilities Immediately After the Tyman Acquisition, as Quanex Reviewed Those Facilities and Attempted to Fix Their Problems

140. Upon closing the acquisition of Tyman on August 1, 2024, Defendants immediately conducted a further investigation into the systematically flawed Tyman facilities, which included facilities like Monterrey that were known to have substantial operational problems. As Wilson explained on Quanex's September 6, 2024 earnings call for 3Q 2024:

38

> Once the deal was finalized, we hit the ground running by continuing to work closely with our integration consultants, while also engaging with the legacy Tyman team. We set up a full-time integration management office that includes cross-functional leaders from both legacy companies, and we are working quickly to establish a new organizational structure that is scalable and will drive us successfully into the future.

Zuehlke explained that this included "performing a full physical inventory count at all legacy Tyman manufacturing plants prior to our fiscal year-end on October 31[, 2024]."

141. Further demonstrating Defendants' scienter, as FE1 noted, an SAP system allowed management to monitor the poor performance of the Monterrey Facility, and as FE2 noted the problems at the Monterrey Facility were discussed in sales and operational meetings. Soon after the acquisition closed, by January 2025, Quanex sent FE5, the Director of Operations, to the Monterrey Facility to try to fix its ongoing substantial problems. This followed customer warnings to Quanex about the poorly performing Monterrey Facility. Moreover, the FEs confirmed that employees widely knew of the systematically outdated legacy Tyman facilities and the especially unreliable Monterrey Facility, and Tyman employees and management became part of Quanex and were deeply involved in the integration process after the acquisition closed.

### 3. The "Core Operations" Doctrine Further Supports a Strong Inference of Scienter

142. The acquisition of Tyman was the key driver of Quanex's growth from stalled revenue of just over $1 billion annually to the much larger goal of $2 billion in annual revenue. The key to that growth was Tyman's AmesburyTruth subsidiary, which made up the largest portion of its revenue and the bulk of its workforce. Thus the performance of the legacy Tyman facilities at the AmesburyTruth subsidiary were critically important to the acquisition and to Quanex's subsequent performance.

143. Moreover, Defendants repeatedly stated that Quanex was a "manufacturing company" focused on "safety," and the main component of the acquisition was Tyman's

manufacturing facilities.   Those facilities were widely known within the company to have substantial performance problems, which stemmed from systematic underinvestment, outdated machinery, and poorly maintained and unsafe equipment.   Further calling attention to these problems, the legacy Tyman facilities regularly had customer backlogs, cancelled orders, and high manufacturing costs, all of which eroded earnings.   Certain legacy Tyman facilities, like in Monterrey, had especially poor performance, that negatively impacted other facilities throughout the AmesburyTruth network.   Notably, Tyman and Quanex had real time data showing the slow, inefficient, and inadequate production at facilities like Monterrey.   Both Tyman and Quanex thus attempted to fix the problems at the Monterrey Facility, and Quanex ultimately suffered a negative impact on its adjusted EBITDA owing to the cost and difficulty of doing so.

144.   Given the substantial investigations that Defendants conducted into the legacy Tyman facilities prior to and throughout the Class Period, and the number of times that Defendants made statements implicating their knowledge about legacy Tyman's manufacturing capabilities throughout the Class Period, Defendants had more than sufficient opportunity to ensure that their statements were accurate.   That is especially so given that the legacy Tyman facilities and their substantial problems were core to the acquisition and to Quanex's operations.

### 4. Defendants Were Motivated to Undertake the Tyman Transaction in Order to Reach their $2 Billion Annual Revenue Goal

145.   Defendants had long attempted to bring Quanex's annual revenue to $2 billion, but had been unable to do so through organic growth, which had stalled.   Tyman offered Defendants the necessary amount of additional revenue to enable them to reach their $2 billion goal.   Before agreeing to the acquisition in April 2024, Quanex and Defendants had previously attempted to purchase Tyman at least twice, but Quanex had been unwilling to pay a price that Tyman would accept.   With no other apparent option to reach their revenue goal, by April 2024, Defendants were

motivated to acquire Tyman, and secure shareholder approval for the acquisition, irrespective of its substantial manufacturing and operational problems.  But Defendants did not disclose to Quanex shareholders that they were acquiring a company with substantial manufacturing problems, which undercut their rationale and price for acquiring Tyman.

## VII.    THE TRUTH EMERGES

146.    After the market closed on Thursday, September 4, 2025, Quanex filed a press release with the SEC on Form 8-K reporting 3Q 2025 earnings results that began to reveal the truth about the substantial manufacturing problems at the Monterrey Facility.

147.    The press release reported poor financial performance for 3Q 2025 and lowered guidance for the remainder of FY 2025.  For 3Q 2025, Quanex's oft-touted adjusted EBITDA was just $70.3 million.  This fell far short of analyst expectations.  For example, analysts Sidoti & Company ("Sidoti") and Benchmark had respectively predicted $80.4 million and $80.8 million in adjusted EBITDA for 3Q 2025.

148.    Defendants also reduced Quanex's adjusted EBITDA guidance for FY 2025 by $35 million to $40 million (from a prior range of $270 million to $280 million down to $235 million).  Defendants cut Quanex's revenue guidance for FY 2025 by $20 million to $40 million too (from a prior range of $1.84 billion to $1.86 billion down to $1.82 billion).  Until then, Defendants had repeatedly reaffirmed Quanex's FY 2025 guidance, most recently on June 6, 2025.

149.    In the press release, Defendants primarily blamed the poor 3Q 2025 results and FY 2025 guidance on "operational challenges related to the legacy Tyman window and door hardware business in Mexico [which] impacted results."

150.    Then, after the market opened the following day, Friday, September 5, 2025, Defendants held an earnings call in which they fully disclosed that Quanex's poor performance resulted from the substantial manufacturing problems at the Monterrey Facility.  On the call,

Defendants admitted that the challenges in "Mexico" that were negatively impacting Quanex were "tooling and equipment issues at our Monterrey, Mexico facility," which had negatively "impact[ed] backlog and lead[] to inefficiencies and increased costs for items such as expedited freight."  As a result, Defendants admitted that they had made "leadership changes and are dedicating additional resources and capital to the [Monterrey] facility to address and resolve these issues in an expedited manner."  This included "upgrading the facility's capabilities, processes and equipment to Quanex standards," "putting systems in place," and "spending money on assets."

151.    Further, Defendants admitted that the substantial problems at the Monterrey Facility dated back to before the acquisition, when Tyman owned it.  Wilson noted those problems were "operational issues we inherited."  As he explained, "we were underinvested and that the tooling condition and the equipment condition [at Monterrey] was not where we wanted to be, and it was not going to be healthy to support our customers. So we had to make some changes and fix some things before it was catastrophic."  Wilson added that the Monterrey Facility needed to "methodically anticipate and plan for tooling repairs," and "I don't want to say it was nonexistent, but again, not up to the standards. And you get to a point where if you're not maintaining tools and equipment, but you continue to try to run and you block off cavities, then it creates quality problems and other issues, and it will eventually catch up to you."

152.    Defendants quantified the dis-synergy cost to Quanex's Hardware segment associated with the Monterrey Facility's problems as $5 million in adjusted EBITDA in 3Q 2025. They also disclosed that these issues would impact Quanex again in 4Q 2025.  Three months later, on Quanex's December 12, 2025, earnings call, Zuehlke disclosed that the dis-synergy cost associated with the Monterrey Facility was "approximately $8 million" in 4Q 2025.  These costs were over 7% of Quanex's adjusted EBITDA in 3Q 2025 ($5 million against $70.3 million), and

over 11% of its adjusted EBITDA in 4Q 2025 ($8 million against $70.9).

153.    Although these costs were so large, Defendants explained that they had no choice but to incur them to fix the critical Monterrey Facility.  They flatly stated, "we're not sparing any expense and trying to be cute. We're fixing the solution," because "for us, again, the priority is fixing Monterrey and getting that solved."

154.    Analysts reacted with alarm to the disclosure of the problems at the Monterrey Facility.  For instance, on September 10, 2025, Sidoti lowered its estimates for Quanex's FY 2025 and FY 2026 earnings per share, noting that Quanex was "challenged by operational issues at a window and door hardware plant in Monterrey Mexico," which the analyst expected to continue through at least 2Q 2026.  The Sidoti analyst added, "We think a central near-term focus for investors will be on management's execution on addressing the operational issues in Mexico in a timely manner."

155.    Indeed, in response to the foregoing revelations, Quanex's common stock fell from a closing price of $20.91 on Thursday, September 4, 2025, to a closing price of $18.18 on Friday, September 5, 2025—a drop of over 13%.  Quanex's common stock then fell another 11% on Monday, September 8, 2025, when its closing price was $16.20.  In total, this erased approximately $218 million in shareholder value.

## VIII.    LOSS CAUSATION

156.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and members of the Class.  During the Class Period, Plaintiffs and Class members held Quanex common stock as of the acquisition's record date and were entitled to participate in the shareholder vote on the acquisition, and/or purchased Quanex's common stock at artificially inflated prices caused by Defendants' misconduct alleged herein.  The price of Quanex's common stock declined significantly when the substantial problems and risks

43

concealed by Defendants were disclosed and Defendants' materially false and/or misleading statements and omissions were revealed to the market, causing investors' losses.

157.    Before the end of the Class Period, on September 4 and 5, 2025, investors had been unaware of the following material facts about Quanex that had been known to Defendants, including that:

(a)    the Monterrey Facility was undermaintained, unsafe, performing poorly, and causing customer backlogs, which undermined revenue and earnings, dating back to well before Quanex purchased Tyman and continuing throughout the Class Period; and

(b)    Tyman and Quanex had attempted to fix the problems at the Monterrey Facility, which were systematic throughout legacy Tyman facilities, but failed to do so, until Quanex invested substantial time and money into this effort, which had substantial negative impacts on Quanex's adjusted EBITDA.

158.    Defendants' materially false and/or misleading statements and omissions, as alleged above, misstated and concealed the true adverse material facts from the market during the Class Period, leading investors to wrongly believe that: (a) the legacy Tyman facilities had no significant manufacturing, operational, equipment, personnel, or safety deficiencies; and (b) the integration was proceeding smoothly and lacked any material "dis-synerg[ies]".

159.    As alleged above, these material facts were revealed to investors—and/or the undisclosed risks materialized—for the first time on September 4 and 5, 2025 when Defendants revealed: (a) lower-than-expected adjusted EBITDA for 3Q 2025; and (b) a reduction in FY 2025 guidance; (c) attributable in large part to "operational challenges" involving Monterrey and Quanex's attempts to fix those problems.

44

160.   The market reacted swiftly and negatively to these disclosures, which were made after trading hours on September 4, 2025 and during trading hours on September 5, 2025.  As a result of these disclosures, on Friday, September 5, 2025, and Monday, September 8, 2025, the price of Quanex's common stock dropped over 13% and approximately 11%, respectively, on heavy volume.  In total, approximately $218 million of shareholder value was erased.

## IX.   CLASS ACTION ALLEGATIONS

161.   Plaintiffs bring this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all persons and entities that: (a) held shares of Quanex common stock on the June 4, 2024 record date of the acquisition that were entitled to vote on Quanex's proposed acquisition of Tyman; and/or (b) purchased or otherwise acquired Quanex's securities during the Class Period (June 6, 2024 to September 4, 2025, inclusive); and were damaged thereby.  Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have or had a controlling interest.

162.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Quanex's common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.  Throughout the Class Period, millions of shares of Quanex's common stock were actively traded on the NYSE (an open and efficient market) under the symbol "NX."  Record owners and other members of the Class may be identified from records maintained by Quanex or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

163.    Plaintiffs' claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws, which is complained of herein.

164.    Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

165.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated §14 of the Exchange Act;

(b)     whether Defendants violated §10(b) of the Exchange Act;

(c)     whether Defendants violated §20(a) of the Exchange Act;

(c)     whether the Proxy Statement, quarterly and annual reports, and other statements disseminated to the investing public and the Company's shareholders during the Class Period omitted and/or misstated material facts about Quanex's business, operations, and prospects;

(e)     whether the market price of Quanex's common stock during the Class Period was artificially inflated due to the material misstatements and failures to correct the material misstatement complained of herein; and

(f)     to what extent Class members have sustained damages and the proper measure of damages.

166.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Further, as the

46

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.     APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND AFFILIATED UTE PRESUMPTIONS OF RELIANCE

167.    The market for Quanex's common stock was open, well developed, and efficient at all relevant times.  As a result of Defendants' materially false or misleading statements and material omissions, the Company's common stock traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Quanex's common stock, relying on the integrity of the market price of such securities and on publicly available market information relating to Quanex.  Plaintiffs and Class members have been damaged thereby.

168.    During the Class Period, the artificial inflation of the value of Quanex's common stock was caused by the materially false statements and/or misstatements and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiffs and other Class members.  As alleged herein, during the Class Period, Defendants made, or caused to be made, a series of materially false and/or misleading statements and omissions about Quanex's and legacy Tyman's business and operations, causing the price of the Company's common stock to be artificially inflated at all relevant times.  When the truth was disclosed, it drove down the value of Quanex's common stock, causing Plaintiffs and other Class members that had purchased or otherwise acquired Quanex's common stock at artificially inflated prices to be damaged as a result.

169.    At all relevant times, the market for Quanex's common stock was efficient for the following reasons, among others:

(a)     Quanex's common stock met the requirements for listing and was listed and

47

actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, Quanex filed periodic public reports with the SEC and/or the NYSE;

(c)    Quanex regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Quanex was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

170.    Based on the foregoing, during the Class Period, the market for Quanex's common stock promptly digested information regarding the Company from all publicly available sources and reflected such information in the price of Quanex's common stock. Under these circumstances, the market for Quanex's common stock was efficient during the Class Period and, therefore, investors' purchases of Quanex's common stock at artificially inflated market prices give rise to a Class-wide presumption of reliance under the fraud-on-the-market doctrine.

171.    In addition, a Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded in Defendants' materially false statements and/or misstatements and omissions, which concealed that throughout the Class Period:

(a)    the Monterrey Facility was undermaintained, unsafe, performing poorly and

48

causing customer backlogs, which undermined revenue and earnings, dating back to well before Quanex purchased Tyman and continuing throughout the Class Period; and

(b)     Tyman and Quanex had attempted to fix the problems at the Monterrey Facility, which were systematic throughout legacy Tyman facilities, but failed to do so, until Quanex invested substantial time and money into this effort, which had substantial negative impacts on Quanex's adjusted EBITDA.

172.    Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business, operations, and prospects—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    NO SAFE HARBOR

173.    The statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be materially false and/or misleading herein that relate to then-existing facts and conditions, nor does it apply to any material omissions alleged herein. To the extent that statements alleged to be false or misleading are characterized as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements, and Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the

49

time each such statement was made.

174.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those materially false and/or misleading forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false and/or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Quanex who knew that the statement was false and/or misleading when made.

## XII.    PROXY CLAIMS

<u>COUNT I</u>
**Violation of §14 of The Exchange Act**
**(Against All Defendants)**

175.    Plaintiffs repeat and reallege the allegations in ¶¶1-9, 13-106, and 146-174 as if set forth fully herein.  For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

176.    The Proxy Statement issued by Quanex contained materially false statements and/or omitted material facts required to be stated in order to make the statements contained therein not misleading as described above.

177.    Defendants jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy Statement and Supplement.

178.    The Proxy Statement was issued "BY ORDER OF THE BOARD OF DIRECTORS."  Moreover, Defendants allowed the Proxy Statement to represent that they recommended the acquisition.

179.    By means of the Proxy Statement, Defendants sought to secure Plaintiffs' and other

50

Class members' approval of the Tyman acquisition and solicited proxies from the Plaintiffs and other members of the Class.

180.     Each Defendant named in this Count acted negligently in making false and misleading statements of material facts, omitting material facts required to be stated in order to make the statements contained therein not misleading, and failing to update their statements, which were false at the time they were issued and were also rendered false and misleading by additional material information which arose after the dissemination of these statements and before the vote on the Tyman acquisition and the acquisition closed.

181.     The Proxy Statements' false and misleading statements and solicitations described herein were essential links in the accomplishment of the Tyman acquisition.  As a result of these statements and solicitations, Quanex shareholders approved the Tyman acquisition.

182.     Plaintiffs and Class members eligible to vote on the Tyman acquisition were denied the opportunity to make an informed decision in voting on the Tyman acquisition and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

183.     This claim is brought within the applicable statute of limitations.

184.     By reason of the foregoing, Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. §240.14a-9.

### COUNT II
### Violation of §20(a) of the Exchange Act
### (Against Defendants Wilson and Zuehlke)

185.     Plaintiffs repeat and reallege the allegations in ¶¶1-9, 13-106, and 146-184 as if set forth fully herein.

186.     For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This

51

claim is based solely in negligence.

187.    As alleged above, Defendants violated Section 14(a) of the Exchange Act by their acts and omissions as alleged in this Amended Complaint.

188.    Each of the Defendants acted as controlling persons within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, control over material operational data, and their power to control the Proxy Statement, Defendants had the power and ability to control the information contained in the Proxy Statement.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

189.    Plaintiffs and Class members eligible to vote on the merger were denied the opportunity to make an informed decision in voting on the merger and were damaged as a direct and proximate result of the untrue statements, omissions and solicitations in the Proxy Statement.

190.    This claim is brought within the applicable statute of limitations.

191.    By reason of the foregoing, Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

## XIII.  FRAUD CLAIMS

### COUNT III
### Violation of §10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

192.    Plaintiffs repeat and reallege the allegation set forth in ¶¶1-8, 10-92, and 107-174 above as if fully set forth herein.  This claim is asserted against all Defendants.

193.    During the Class Period, Defendants: (i) knowingly, or with reckless disregard, deceived the investing public, including Plaintiffs and Class members, as alleged herein; (ii)

artificially inflated and/or maintained the market price of Quanex's common stock; and (iii) caused Plaintiffs and Class members to purchase, or otherwise acquire, Quanex's common stock at artificially inflated prices.

194.    Each of the Defendants, in violation of §10(b) of the Exchange Act and Rule 10b-5(b), made false statements of material facts and omitted to state material facts necessary to make the statements made by Defendants not misleading alleged above, which operated as a fraud and deceit upon Plaintiffs and the Class, in an effort to create or maintain an artificially inflated price of Quanex's common stock during the Class Period.

195.    As a result of their making and/or substantially participating in the creation of affirmative statements to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with applicable laws and regulations.

196.    As officers, directors, and controlling persons of a publicly held Company, whose common stock is registered with the SEC, pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, Wilson and Zuehlke had a duty to promptly disseminate accurate and truthful information regarding the Tyman acquisition, the operations of Quanex and legacy Tyman facilities, Quanex's financial condition and performance, growth, business, management, earnings, and business prospects, and to correct any previously issued statements that had become materially false or misleading, so that the market price of Quanex's publicly traded securities would be based upon truthful and accurate information.

197.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, made, or substantially participated in, the creation and/or dissemination of false or misleading statements of material fact, as set forth

herein, or with reckless disregard failed to ascertain and disclose truthful facts, even though such facts were available to them.

198.    The facts alleged herein give rise to a strong inference that each of the Defendants acted with scienter.  Each of the Defendants knew, or recklessly disregarded, that the Class Period statements set forth above contained false statements and/or misrepresentations and omissions for the reasons set forth herein.

199.    By virtue of Wilson and Zuehlke's positions of management and control within Quanex, they had access to undisclosed adverse information about Tyman acquisition, the operations of Quanex and legacy Tyman facilities, Quanex's financial condition and performance, growth, business, management, earnings, and business prospects.  Wilson and Zuehlke would ascertain such information through: (a) the Company's internal corporate documents; (b) conversations and connections with corporate officers and employees; (c) attendance at conferences and management and Board of Directors meetings, including committees thereof; and (d) reports and other information provided to them in connection with their roles and duties as Quanex officers and directors.

200.    Wilson and Zuehlke were aware of, or recklessly disregarded, that material misrepresentations and omissions detailed above, and approved or ratified such statements in violation of the federal securities laws.

201.    As a result of Defendants' dissemination of the materially false or misleading information, and their failure to disclose material facts, as alleged herein, the market price of Quanex's common stock was artificially inflated throughout the Class Period.  Unaware that the market price of Quanex's common stock was artificially inflated, relying directly or indirectly on the false or misleading statements made by Defendants, at the times such statements were made,

54

or relying upon the integrity of the markets in which Quanex's common stock traded, and in the absence of material adverse information that was known, or recklessly disregarded, by Defendants, but not disclosed to the public, Plaintiffs and Class members purchased or otherwise acquired Quanex's common stock at artificially inflated prices.

202. Had Plaintiffs and the other Class members known the truth regarding the problems that Quanex was experiencing, which was not disclosed by Defendants, Plaintiffs and other Class members would not have acquired Quanex securities during the Class Period at the artificially inflated prices which they paid.

203. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases and sales of Quanex's common stock during the Class Period, when the artificial inflation in the price of such securities dissipated, as the truth regarding Defendants' conduct was revealed and/or the undisclosed risks materialized, causing the price of Quanex's common stock to decline and economic losses to Plaintiffs and the Class.

204. By reason of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder, and they are liable to Plaintiffs and the Class for damages suffered in connection with their transactions in Quanex's common stock during the Class Period.

**COUNT IV**
**Additional Violation of §20(a) of the Exchange Act**
**(Against Defendants Wilson and Zuehlke)**

205. Plaintiffs repeat and reallege each and every allegation set forth in ¶¶1-8, 10-92, 107-174 and 192-204 above as if fully set forth herein. This claim is asserted against Defendants Wilson and Zuehlke.

206. Quanex is a primary violator of §10(b) and Rule 10b-5, promulgated thereunder.

55

207.    Wilson and Zuehlke acted as controlling persons of Quanex within the meaning of §20(a) of the Exchange Act.  Wilson and Zuehlke had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence, and during the Class Period, did exercise their power to control and influence, the conduct giving rise to the violations of the federal securities laws alleged herein.  Wilson and Zuehlke prepared, or were responsible for preparing, the Company's press releases and SEC filings, and made statements to the market in SEC filings, financial reports, conference calls, and at Quanex's February 6, 2025 Analyst/Investor Day.  Wilson and Zuehlke controlled Quanex and each of its employees.

208.    Wilson and Zuehlke were able to, and did, control the content of the various SEC filings, and other public statements pertaining to the Company during the Class Period.  Wilson and Zuehlke were provided with copies of the documents, as alleged herein, containing false statements and/or material misstatements and omissions prior to, or shortly after, their issuance and had the ability and/or opportunity to prevent the issuance of such documents or cause them to be corrected.  Accordingly, Wilson and Zuehlke are responsible for the accuracy of the Company's SEC filings, press releases, and other public statements.

209.    By virtue of their positions as controlling persons of Quanex, and by reason of the conduct described in this Count, Wilson and Zuehlke are liable pursuant to §20(a) of the Exchange Act for controlling a primary violator of the federal securities laws.  As a direct and proximate result of Wilson and Zuehlke's wrongful conduct, Plaintiffs and other Class members suffered damages in connection with their purchases of Quanex common stock during the Class Period.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for relief and judgment as follows:

56

A.      declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.      awarding compensatory damages in favor of Plaintiffs and all other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.      awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel and expert fees; and

D.      awarding such other and further relief as the Court may deem just and proper.

## XV.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


DATED: March 24, 2026

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/ Max R. Schwartz*
Max R. Schwartz (*pro hac vice*)
Donald A. Broggi (*pro hac vice forthcoming*)
Jeffrey P. Jacobson (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
mschwartz@scott-scott.com
dbroggi@scott-scott.com
jjacobson@scott-scott.com

*Counsel for Lead Plaintiff Roofers' Pension Fund and Plaintiff Erie County Employees' Retirement System*

**FOGLER, O'NEIL & GRAY, LLP**
Murray J. Fogler (State Bar No. 07207300, SDTX Federal No. 2003)
909 Fannin, Suite 1640

Houston, Texas 77010
Telephone: (713) 481-1010
Facsimile: (713) 574-3224

*Local Counsel for Lead Plaintiff Roofers' Pension Fund and Plaintiff Erie County Employees' Retirement System*

58

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

I, Dr. Kyle Foust, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am the Erie County, Pennsylvania Controller and have responsibility for the administration of the Erie County Employees' Retirement System ("Erie County" or "Plaintiff").

2.     I have reviewed the Class Action Complaint filed in *Zanol v. Quanex Building Products Corp.*, No. 4:45-cv-04453 (S.D. Tex.) ("Complaint"), and authorize the filing of this Certification on behalf of Erie County.

3.     Erie County is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.     Erie County was a holder of Quanex Building Products Corp. ("Quanex") common stock as of June 4, 2024, the date of the issuance of the Proxy Statement.  During the Class Period (as defined in the Complaint), Erie County purchased additional Quanex common stock that is subject of the Complaint as set forth in the attached Schedule A.

5.     Erie County did not engage in the foregoing transactions at the direction of counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

6.     Erie County has not sought to serve or served as a representative party in a class action that was filed under federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

- *In re: AdaptHealth Corp. Sec. Litig.*, Case No. 2:23-cv-04104 (E.D. Pa. Oct. 24, 2023);

- *Erie Cnty. Employees' Ret. Sys. v. Hayward Holdings, Inc.*, Case No. 2:23-CV-20764 (D.N.J. Dec. 19, 2023);

1

- *In re Compass Sec. Litig.*, Case No. 8:25-cv-00981 (C.D. Cal. May 9, 2025); and

- *In re Compass Diversified Holdings Sec. Litig.*, Case No. 3:25-cv-00758 (D. Conn. May 12, 2025).

7.    Erie County will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any recovery, except for such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States of America, the foregoing is true and correct this 24th day of March 2026.

**ERIE COUNTY EMPLOYEES' RETIREMENT SYSTEM**

_____
Kyle Foust

# Schedule A

**QUANEX BUILDING PRODUCTS**  **Ticker:** **NX**  **Cusip:** **747619104**
Class Period: 06/06/2024 to 09/04/2025

**ERIE COUNTY EMPLOYEES' RETIREMENT SYSTEM**

| | DATE | SHARES | PRICE |
|---|---|---|---|
| Purchases: | 3/14/2018 | 200 | $18.13 |
| | 3/14/2018 | 1,100 | $17.98 |
| | 3/16/2018 | 200 | $18.08 |
| | 4/11/2018 | 100 | $17.73 |
| | 6/1/2018 | 300 | $16.73 |
| | 6/1/2018 | 300 | $16.80 |
| | 6/4/2018 | 200 | $16.30 |
| | 6/5/2018 | 700 | $18.45 |
| | 6/5/2018 | 300 | $18.90 |
| | 6/5/2018 | 400 | $18.31 |
| | 6/5/2018 | 300 | $18.75 |
| | 6/8/2018 | 100 | $18.84 |
| | 6/11/2018 | 300 | $19.10 |
| | 6/11/2018 | 300 | $19.20 |
| | 6/13/2018 | 100 | $19.00 |
| | 6/18/2018 | 100 | $18.66 |
| | 6/22/2018 | 200 | $18.04 |
| | 6/22/2018 | 300 | $18.35 |
| | 7/10/2018 | 200 | $17.98 |
| | 7/11/2018 | 100 | $17.78 |
| | 7/12/2018 | 100 | $17.70 |
| | 7/20/2018 | 200 | $17.80 |
| | 7/23/2018 | 200 | $17.60 |
| | 7/24/2018 | 100 | $17.50 |

| | | |
|---|---|---|
| 7/31/2018 | 100 | $17.46 |
| 8/1/2018 | 100 | $17.00 |
| 8/1/2018 | 100 | $17.07 |
| 8/7/2018 | 100 | $16.96 |
| 9/5/2018 | 800 | $16.10 |
| 9/7/2018 | 100 | $18.47 |
| 9/7/2018 | 1,000 | $18.44 |
| 9/24/2018 | 100 | $18.15 |
| 1/25/2019 | 200 | $15.00 |
| 12/23/2019 | 200 | $17.90 |
| 1/2/2020 | 200 | $16.89 |
| 1/7/2020 | 200 | $16.65 |
| 1/21/2020 | 100 | $17.60 |
| 1/24/2020 | 100 | $17.89 |
| 1/28/2020 | 100 | $18.03 |
| 1/29/2020 | 300 | $17.82 |
| 1/31/2020 | 100 | $17.70 |
| 2/3/2020 | 100 | $17.89 |
| 2/3/2020 | 300 | $17.82 |
| 2/27/2020 | 200 | $17.64 |
| 2/28/2020 | 100 | $16.81 |
| 3/9/2020 | 100 | $14.52 |
| 3/10/2020 | 300 | $14.60 |
| 3/12/2020 | 100 | $13.42 |
| 3/16/2020 | 200 | $10.94 |
| 3/18/2020 | 100 | $9.11 |
| 4/1/2020 | 200 | $9.39 |
| 4/2/2020 | 100 | $9.25 |
| 4/6/2020 | 100 | $9.86 |
| 9/4/2020 | 100 | $18.44 |
| 9/4/2020 | 100 | $17.87 |
| 12/17/2020 | 200 | $22.45 |
| 1/29/2021 | 100 | $22.06 |
| 3/2/2021 | 100 | $24.84 |

| | | |
|---|---|---|
| 4/20/2021 | 100 | $26.70 |
| 5/17/2021 | 200 | $26.79 |
| 6/18/2021 | 200 | $24.78 |
| 6/24/2021 | 6 | $24.67 |
| 6/28/2021 | 19 | $24.55 |
| 7/12/2021 | 200 | $24.34 |
| 7/14/2021 | 100 | $23.65 |
| 7/19/2021 | 100 | $23.16 |
| 7/28/2021 | 100 | $24.20 |
| 8/9/2021 | 100 | $24.00 |
| 8/16/2021 | 100 | $24.42 |
| 10/18/2021 | 100 | $21.03 |
| 10/22/2021 | 100 | $21.08 |
| 12/20/2021 | 300 | $22.71 |
| 12/21/2021 | 100 | $23.33 |
| 1/19/2022 | 100 | $23.07 |
| 2/1/2022 | 100 | $21.97 |
| 4/8/2022 | 200 | $20.71 |
| 6/13/2022 | 500 | $22.78 |
| 7/8/2022 | 100 | $22.90 |
| 8/2/2022 | 100 | $24.58 |
| 12/5/2022 | 200 | $23.92 |
| 3/7/2023 | 100 | $24.56 |
| 9/4/2024 | 500 | $25.27 |
| 9/10/2024 | 100 | $25.79 |
| 12/19/2024 | 200 | $23.10 |
| 1/14/2025 | 100 | $22.44 |
| 2/4/2025 | 100 | $19.91 |
| 2/5/2025 | 61 | $20.66 |
| 2/5/2025 | 39 | $20.56 |
| 3/11/2025 | 100 | $18.96 |
| 3/26/2025 | 100 | $19.61 |
| 3/31/2025 | 100 | $18.53 |
| 4/15/2025 | 100 | $16.89 |

|        |            | Date       | Shares | Price   |
|--------|------------|------------|--------|---------|
|        |            | 5/2/2025   | 100    | $16.96  |
|        |            | 6/10/2025  | 100    | $20.05  |
|        |            | 6/13/2025  | 200    | $19.35  |
|        |            | 6/23/2025  | 100    | $18.10  |
|        |            | 7/15/2025  | 100    | $18.78  |
|        |            | 7/16/2025  | 100    | $18.52  |
|        |            | 7/17/2025  | 100    | $18.70  |
|        |            | 7/18/2025  | 100    | $18.43  |
|        |            | 7/23/2025  | 100    | $19.78  |
|        |            | 8/27/2025  | 100    | $21.75  |
|        |            | 8/27/2025  | 100    | $21.91  |
|        |            | 9/2/2025   | 100    | $20.76  |
| Sales: |            | 8/29/2018  | 500    | $16.55  |
|        |            | 6/12/2019  | 700    | $17.06  |
|        |            | 6/13/2019  | 200    | $17.91  |
|        |            | 6/14/2019  | 100    | $18.12  |
|        |            | 6/14/2019  | 100    | $18.05  |
|        |            | 9/5/2019   | 100    | $16.99  |
|        |            | 10/9/2019  | 100    | $19.04  |
|        |            | 10/11/2019 | 200    | $19.03  |
|        |            | 12/11/2019 | 300    | $19.73  |
|        |            | 4/7/2021   | 300    | $26.68  |
|        |            | 5/6/2021   | 200    | $27.30  |
|        |            | 9/8/2021   | 300    | $21.76  |
|        |            | 2/27/2023  | 1,000  | $25.98  |
|        |            | 3/14/2023  | 2,900  | $19.80  |
|        |            | 11/14/2023 | 100    | $30.85  |
|        |            | 12/1/2023  | 100    | $31.47  |
|        |            | 12/6/2023  | 200    | $32.06  |
|        |            | 12/12/2023 | 100    | $32.58  |
|        |            | 12/13/2023 | 100    | $33.00  |
|        |            | 12/14/2023 | 200    | $34.82  |
|        |            | 3/20/2024  | 100    | $37.25  |
|        |            | 3/21/2024  | 200    | $38.39  |

| | | |
|---|---|---|
| 3/21/2024 | 100 | $38.36 |
| 3/28/2024 | 200 | $38.82 |
| 3/6/2025 | 200 | $19.96 |
| 3/10/2025 | 200 | $20.63 |